## J. C. KEARBY v. S. B. HOPKINS ET AL.

Delivered June 3, 1896.

**1.    Mortgages—Extension of Time—Right of Second Mortgagee.**

The owner of land subject to a mortgage sold and conveyed it to H. and T. in divided half interests, each of them assuming one-half the mortgage debt, and T. thereafter conveyed his interest to a vendee, who likewise assumed one-half the mortgage debt, and for balance of the purchase money gave to T. certain vendor's lien notes which T. assigned to a bank as collateral.    The mortgage debt was not paid at maturity, and H. and T. obtained an extension thereon for two years, but within that time the bank purchased the mortgage debt, and at once had it foreclosed by a sale of the property, made by the trustee appointed in the mortgage, the half interests being sold separately.    Held, that the bank was not a subsequent incumbrancer as to the H. half, and that a purchaser of that half at the trustee's sale could not invoke, to sustain the validity of the sale, the doctrine of a subsequent incumbrancer's right to buy in a former mortgage and have it foreclosed for his own protection.

**2.    Same—Extension of Debt—Consent of Minor.**

H. had conveyed, before the extension of the mortgage debt, his half interest to a minor daughter, who had no legally appointed guardian of her estate, but in whose interest H. acted in attending to the property and paying out his debt due thereon. The bank, having bought in the mortgage debt, proceeded to foreclose at once, and within the two years' extension, upon the theory that the extension as to H's. interest was void because made without legal authority of the minor, and therefore void in toto.    Held, that the minor could not assume the payment of the incumbrance, which remained the personal obligation of H., and the mortgage being simply an incident to a debt which she did not owe, H. could have its payment extended, whether she consented or not.

**3.    Fraudulent Conveyance —Right of Subsequent Creditor.**

Where the owner of land covered by a mortgage conveys it to a minor daughter as a gift, one who was not a creditor of his at that time, but who afterwards became the assignee of the mortgage debt, cannot attack such conveyance as being a fraud upon the mortgagor's creditors.

**4.    Extension of Note—Consideration—Forbearance.**

Where the owner and the maker of a note agree that it shall be extended for a stipulated time, though it be at a reduced rate of interest, the owner forbearing his right to sue, and the maker his right to pay the debt for the stipulated time, such agreement is upon sufficient consideration as to both parties.

**5.    Same—Written Memoranda—Statute of Frauds of One Year.**

An agreement to extend a note for a longer period than one year is within the statute of frauds; but where such extension was negotiated by letters fully showing the terms of the agreement of extension, passing between the owner of the note, the maker, and their agents, the agreement was sufficiently in writing to be taken out of the statute.

**6.  Same.**

When the time of payment of a mortgage is extended, the right to foreclose it is suspended until the expiration of the extended time, and the extension has the effect in equity of modifying the orignal conditions of the mortgage to the same extent as if the time of the new agreement was incorporated in the condition.

**7.  Mortgage Sale Invalid—Time of Payment Extended.**

A sale by a trustee by virtue of the terms of a mortgage, is invalid if made within the time for which the mortgage debt has been extended by agreement of the parties.

APPEAL from Dallas.    Tried below before Hon. R. E. BURKE.

*J. C. Muse*, for appellant.—1.   The court erred in holding that the $10,000 note secured by the trust deed under which the sale to this appellant was made, was not due when the sale was made, thus holding that there had been a binding extension of time for the payment of said note, because:

(a)   The pretended extension of time, having been made without the knowledge or consent of the North Texas National Bank, a second lien holder, to more than the value of the property, was not binding on said bank, and it had a right to repudiate the same as it did; and said pretended extension of time was not binding on the minor, Maud Hopkins. Jones on Mort., sec. 942.

(b)   Said pretended extension of time, being for more than one year, and not having been in writing, as prescribed by the Statute of Frauds, was void under the Statute of Frauds.   Rev. Stats., art. 2464, subdiv. 5; Mills v. Todd, 83 Ind., 27; Warner v. Railway, 54 Fed. Rep., 922.

(c)   Said pretended extension of time was wholly without consideration.   Austin Abstract Co. v. Bahn, 27 S. W. Rep., 1047.

(d)   Tillman and Hopkins having wholly failed and refused to comply with their agreement to pay interest, as agreed by them, the holder of the note had a right to repudiate the agreement also, even if it had otherwise been binding.   Ankeny v. Clark, 148 U. S., 345; Stiff v. Fisher, 2 Tex. Civ. App., 346; Overton v. Connor, 50 Texas, 113; Railway v. Gordon, 70 Texas, 80.

2.   An agreement to extend a mortgage debt, made without the knowledge or consent of the holder of a second mortgage on a portion of the property, is not binding on the latter, especially where it appears that the property is worth less than both mortgages, and the effect of the extension would be to impair the security of the second mortgage, and enable the insolvent mortgagor to retain possession of the property at his mortgage creditor's expense.   In such case, the second mortgagee may immediately pay the first mortgagee the amount of his mortgage, take an assignment of the same, and, ignoring the pretended extension, immediately foreclose the mortgage.

3.   The court erred in holding that the trustee had no authority to sell the property in separate parcels, it being the right and duty of the trustee to so sell the property, the said property being fairly susceptible

of subdivision into separate parcels, which separate parcels had passed into the hands of different owners, who desired it so sold.

4. Ever since the decision in Payne v. Powell, 14 Texas, 600, cited with approval and discussed in Benson v. Phipps, 87 Texas, 578, it has been a settled law in Texas that an agreement for extension of time to be binding on one party must be binding on both. While the contracts of a minor are ordinarily voidable only, and not absolutely void, yet as a contract merely voidable is not binding, it is plain that, standing entirely alone, without tender of performance and without additional consideration, it cannot constitute a sufficient consideration to support a contract absolutely binding.

5. That a father who has not been appointed guardian of his minor child's estate, has absolutely no authority whatever to make a contract affecting such estate, at least under existing statutes, is perfectly well settled in Texas. Railway v. Hinzie, Guardian, 82 Texas, 623; Messner v. Giddings, 65 Texas, 301; Railway v. Bradley, 45 Texas, 171-176.

6. In Benson v. Phipps, 87 Texas, 578, it was held that a contract to extend a debt for a definite period is supported by a sufficient consideration, if the debtor at the same time makes a binding contract foregoing his right to pay the debt before the end of the term, and agreeing to pay interest during the extension. But it was also said that where "there was a mere promise by the creditor to forbear, without any corresponding promise on the part of the debtor not to pay during the time of the proposed forbearance, * * * it is clear that there is no consideration for the promise." The court cites with approval Payne v. Powell, 14 Texas, 600, to the effect that there must not only be a promise by the debtor to pay interest, but that such promise must be legally binding, to constitute any consideration for the promise of the creditor to extend the debt. In Austin Real Estate and Abstract Co. v. Bahn, 89 Texas, 582, the distinction is very clearly pointed out, and it was there held that where the creditor agreed to extend the debt for a certain period, but there was no corresponding binding contract by the debtor not to pay during such period, or to pay interest for any definite period, the agreement to extend was without consideration and void.

*Dudley G. Wooten, Dickson & Moroney* and *T. T. Vander Hoeven*, for appellee.

[The brief for appellee did not reach the Reporter.]

NEILL, ASSOCIATE JUSTICE.—The judgment appealed from vacates a sale of certain land sold by John A. Pope, as substitute trustee, in a deed of trust on the premises; and was rendered on the following facts found by the trial court, which we adopt as our conclusions of fact:

"1. On November 9, 1885, H. M. Spalding executed and delivered to Mrs. Susan M. Knowles a note for $10,000, due five years after date,

with interest at seven per cent per annum, payable semi-annually, said note being fully described in plaintiff's petition.

"2. On the same day, to secure the payment of said note, H. M. Spalding executed and delivered to J. F. Kimball, trustee, a deed of trust in the nature of a mortgage, covering 50x200 feet of land then owned by Spalding, and extending through from Commerce street to Jackson street, in the city of Dallas. This deed of trust is fully and properly described in the plaintiff's petition, and is duly acknowleged and recorded as alleged by plaintiff.

"3. Prior to February 4, 1891, by a series of mesne conveyances not material to set forth, the title of the west half of said property, being 25x200 feet, became vested in S. B. Hopkins, who, as hereinafter shown, had deeded it to his daughter, Maud Hopkins; and the title to the east half, 25x200 feet, became vested in E. M. Tillman. Hopkins and Tillman, in purchasing, each personally assumed one-half of the mortgage debt. On said date, February 4, 1891, Tillman and Hopkins each owned a divided half of said property, subject to said trust deed, which was past due and unpaid, and which Mrs. Susan M. Knowles still owned. These tracts, for convenience, are hereinafter called the Tillman tract, and the Hopkins tract, respectively.

"4. Hopkins and Tillman, desiring to secure an extension of time for the payment of said mortgage debt, and Mrs. Susan M. Knowles not desiring to carry the debt further herself, Hopkins and Tillman thereupon entered into an agreement with one C. B. Bowling to purchase the note from Mrs. Susan M. Knowles, and grant an extension of time at an increased rate of interest to them, the said Tillman and Hopkins. They, Hopkins and Tillman then paid the interest to February 4, 1891, and the following endorsements were then put on said note, to-wit: 'Interest paid to February 4, 1891, and principal extended for two years at 10 per cent semi-annual interest; see endorsement below. Without recourse, pay C. B. Bowling or order. [Signed] Susan M. Knowles.'

"Below the above endorsements, the following endorsement was also made at the same time: 'We, E. M. Tillman and S. B. Hopkins, the present owner of the within mentioned property, desiring this note extended for two years from this date, agree to pay interest at the rate of ten per cent per annum, payable semi-annually as it accrues, and to pay said note promptly on the 4th day of February, 1893, at the office of Murphy and Bolanz, Dallas, Texas; further agreeing, if this note is placed in the hands of an attorney for collection, or if collected by suit, to pay ten per cent addition on the full amount due as attorney's fees.

           [Signed]                          'E. M. Tillman,
                                              'S. B. Hopkins.'

"On the same day the above agreement was reduced to writing, in a separate instrument, fully describing the note and trust deed, and this separate instrument was signed by Hopkins and Tillman, acknowledged

for record, and duly recorded in the records of real estate mortgages for Dallas County. Murphy & Bolanz were a firm of real estate and money brokers in Dallas, and they represented Bowling and Mrs. Knowles in negotiating the transaction, though the papers were signed by the principals in person as above shown. The note was duly delivered to Bowling, and Mrs. Knowles has since had nothing to do with the transaction.

"5. About this time, Tillman organized the Southern Distilling Company, a corporation organized under the Texas statutes, and of which he was the president, manager and principal stockholder, as hereinafter more particularly shown. The Southern Distilling Co. occupied the Tillman half of the property as Tillman's tenant, until it purchased the said Tillman half, as hereinafter shown, and after the purchase, occupied the property in its own right until it went out of business. Hopkins, for a time, occupied his half of the property himself, as a place of business, but for some time it has been rented out. The particulars, so far as deemed material to this case, will be more fully shown hereinafter.

"6. On July 2, 1891, there was filed for record in the county clerk's office of Dallas County, a deed from S. B. Hopkins and wife, Mary B. Hopkins, to Maud Hopkins, a minor daughter of S. B. Hopkins, by a former marriage, conveying to said Maud Hopkins the Hopkins half of said property. Said deed purports to have been executed and acknowledged on October 23, 1888, the consideration recited being one dollar, natural love and affection. Maud Hopkins was, at the date of the record of said deed, eleven years· of age, and has had no guardian of her estate, until after the institution of this suit, her father S. B. Hopkins having all along acted as guardian of both her person and estate, paying the taxes, collecting the rents, and negotiating for the protection of said property, with her full knowledge and consent, it being the only piece of property owned or claimed by her in her separate right. The mortgage for $10,000 being a lien on her property at the time her father transferred it to her, he has assumed and exercised the authority to make any and all necessary arrangements for extending said lien and the $10,000 note aforesaid. After the institution of this suit, said Maud Hopkins had a guardian duly appointed for her estate, to represent and protect her interests herein, who is one W. M. C. Hill, and who has duly intervened herein, setting up her title and rights as shown in his petition of intervention.

"7. Said Tillman and Hopkins paid the semi-annual installment of interest on said $10,000 note as follows: August 5, 1891, $500; February 6, 1892, $500; August 8, 1892, $500; February 14, 1893, $500; all of which payments were duly endorsed on said note. No other payments of interest were actually made, except as hereinafter described.

"8. On January 28, 1892, E. M. Tillman and wife executed and delivered to the Southern Distilling Co. a deed conveying his one-half of said property to said company, which was duly acknowledged and

recorded at the time. The consideration recited on the face of this deed was $32,500, as follows: The assumption by said company of the one-half of said $10,000 note, and four vendor's lien notes for $5000 each, due in two, three, four and five years respectively, after date, and one vendor's lien note for $7500, due in six years after date; all of said notes being negotiable in form, made by the Southern Distilling Co., payable to E. M. Tillman or order, with seven per cent interest from date, payable semi-annually, and ten per cent additional as attorney's fees in case of collection by law or by attorneys, and upon default in the payment of any semi-annual installment of interest, or of any one of said notes, when due, the others should become due and payable at the option of the holder or owner of said notes.

"9. On December 1, 1892, the Southern Distilling Co., was indebted to the North Texas National Bank to the amount of upwards of $29,000, E. M. Tillman being personally liable therefor as endorser on its paper. On said date, at the request of the bank, Tillman delivered to the bank the four last named vendor's lien notes above mentioned, aggregating $22,500, as collateral security for the said company's indebtedness, Tillman endorsing said vendor's lien notes to the bank. Subsequently, on September 5, 1893, when the Southern Distilling Co. had become insolvent, and after it had made a deed of trust of other property, Tillman, acting as its president, and by virtue of a resolution of the directors of said company, by deed in writing between it and P. T. Morey, transferred its half of said property then held in the name of the company to P. T. Morey, the then president of the bank, in whom the title was thus vested, he acting for the bank in the transaction, but the transfer was not recorded. The transfer was made subject to all encumbrances, which exceeded the value of the property. Afterwards, on September 7, 1893, the Distilling Co. went into the hands of a receiver, the North Texas National Bank being its principal creditor by reason of the indebtedness above mentioned. The receivership was closed in December, 1894, and the assets distributed, the bank receiving $6\frac{7}{10}$ per cent, its pro rata share of the same as holder of said $29,000 debt. Said real estate was not treated as an asset in this receivership.

"10. About February 1, 1893, said bank borrowed $367,000 in Boston, and pledged most of its assets as collateral security, among which were afterwards included the $22,500 of vendor's lien notes above described. This debt was held by James B. Case and Jacob Edwards and the National Bank of Redemption of Boston. In October, 1893, the North Texas National Bank also became the holder of the original $10,000 note held by C. B. Bowling, as above mentioned.

"11. Shortly after the date of the execution of the vendor's lien notes by the Distilling Co. to Tillman as aforesaid, Tillman transferred and endorsed to Leopold Weiss, the first of said notes for $5000, due January 25, 1894; and said Weiss, now owns and holds said note, and has intervened herein to protect the same as a second lien on said

property.   In the distribution of the assets of the Southern Distilling Co. in December, 1894, Weiss received his pro rata share of the same as holder of said note against said company, being a little over $300.

"12.   On December 28, 1892, Murphy & Bolanz, a firm of real estate agents and loan brokers in Dallas, who had acted as agent for C. B. Bowling, the holder of the $10,000 note, in the first extension of said note, in February, 1891, and were still his agents, wrote to Bowling stating they had tried to secure a second extension of the note by Tillman and Hopkins on the same terms as the first extension, viz: at ten per cent per annum ·interest, and provisions as to attorney's fees as shown in the endorsement of the first extension set out in paragraph four above, but that Tillman and Hopkins were not willing to renew or extend the note at 10 per cent interest; that they would do the best they could in the matter, etc.   In the meantime, Murphy & Bolanz wrote to Tillman and Hopkins the letters mentioned and attached as exhibits in plaintiff's petition.   On January 27, 1893, Murphy & Bolanz wrote to Bowling in Missouri, where he lived, that they had succeeded in securing an extension of the note to Tillman and Hopkins, for two years at 8 per cent interest, payable semi-annually, and that the two parties would be in in a few days and arrange the matter.   On February 8, 1893, they wrote again to Bowling to the same effect, and that the matter had not yet been finally arranged, but would be in a few days, as soon as the parties came in.   On February 16, 1893, Murphy & Bolanz wrote to Bowling, notifying him of the fact that the extension had been finally arranged at 8 per cent for two years, and they enclosed a statement showing payment of the $500 interest by Tillman and Hopkins, being the semi-annual installment due on the last six months prior to February 4, 1893, which last named date was the date of the second extension, the same being endorsed on the note by Bolanz' instruction, in the following words: 'Six months interest paid to February 4, 1893, this February 14, 1893, and the principal of within note is hereby extended for two years, the interest to be paid semi-annually at 8 per cent per annum, instead of ten per cent.'

"Tillman and Hopkins paid Murphy & Bolanz the sum of $250 for negotiating this extension for them, as they had paid them for making the first extension.   In the letter of Murphy & Bolanz to Bowling, of February 8, 1893, they say that they had difficulty in getting Tillman and Hopkins to take the loan for a longer period, because Tillman wanted to pay off his half of the note and only consented to extend it to accommodate Hopkins, who was not ready to pay.   On February 2, 1893, Bowling wrote to Murphy & Bolanz acknowledging their letter of January 27, 1893, and saying that he was glad the extension had been made on the terms indicated; and on February 22, 1893, he acknowledged their letter and enclosed statement of February 16, 1893, expressing himself as satisfied.   By contemporaneous entries on their books, Murphy & Bolanz made a memorandum of the transaction, such entries not being signed.   Afterwards in the summer of 1893, when the first

semi-annual installment of interest was to become due, Bowling wrote to Hopkins the letters mentioned in plaintiff's petition. These letters, above mentioned, and the unsigned endorsement by Bolanz on the note were all that occurred in regard to the second extension. The extension was made with the knowledge and consent of the Southern Distilling Co. and by Hopkins as representing his daughter, Maud, but the North Texas National Bank had no notice of the same. Neither Hopkins nor his daughter had any notice on February 4, 1893, of the bank holding these vendor's lien notes, or that the bank claimed any interest in the property. There was no express provision in the original note, nor in the second extension, for attorney's fees, nor for maturing the principal for default in payment of interest.

"13. When the first installment of interest fell due, under the second extension of the $10,000 note, on August 4, 1893, the Southern Distilling Co. had become insolvent, and on August 18, 1893, made a deed of trust and stopped business; and Tillman, its president and manager, was so involved that he was unable to meet his half of the interest, $200. Hopkins was ready and willing to pay his half, $200, and tried to do so through the American National Bank at Dallas, and so informed Bowling by letter and tendered the money at the bank, but the holder of the note was not willing to accept half of the interest without the other being provided for, and the matter was allowed to run along without any definite settlement of what was to be done. Murphy & Bolanz had failed in business just before this installment of interest was due.

"14. On October 24, 1893, J. F. Kimball, the trustee named in the trust deed to secure the $10,000 note, resigned, and the North Texas National Bank, as holder of said note, on December 9, 1893, by instrument in writing, duly executed and acknowledged, appointed John A. Pope substitute trustee in said deed of trust, and requested him to advertise the property for sale under provisions of said deed of trust, and to apply the proceeds of the same in accordance herewith. Pope accepted the appointment and advertised the property for sale on January 2, 1894, between the hours of 10 o'clock a. m. and 4 o'clock p. m., at the door of the court house of Dallas County, Texas. The regularity of the resignation of Kimball and appointment of Pope is admitted, and that Pope made the advertisement of the sale as stated.

"15. After the advertisement of the sale, as aforesaid, the North Texas National Bank transferred said note to the National Bank of Redemption, of Boston, the legal owner and holder of the note at the date of sale.

"16. The North Texas National Bank was insolvent and in process of voluntary liquidation at the time of the advertisement and sale above mentioned; and has since been wound up and closed out of business, with loss to all of its stockholders of their entire holdings, the Boston creditors having purchased all of its property in satisfaction of their claims, there being no other creditors.

"17. A few days after the substitute trustee, Pope, advertised the property for sale, under the deed of trust, Hopkins learned of the advertisement, and at once employed G. G. Wright, Esq., his usual attorney, to enjoin the sale, on the ground that the note was not due, and would not become due until February 4, 1895, and no foreclosure could be had on the property until said last named date and default in the payment of the note at said date; he so advised and instructed his attorney, and relied upon him to take all necessary steps to enjoin the sale on these grounds.

"18. On January 2, 1893, the day of sale, as advertised, the substitute trustee, Pope, about 11 o'clock a. m., offered the property in separate halves, selling the Tillman half first, the same being bid in for the sum of $5800, and was sold to Theophilus King, of Boston, Mass., who is vice president of the National Bank of Redemption. Deed was duly executed, acknowledged and delivered to said purchaser of the Tillman half, and the purchase price bid for it, less trustee's fees, was credited on the $10,000 note at once. Neither Tillman nor Wiess, nor any one representing them, was present at the sale, or had any knowledge of it until afterwards. G. G. Wright and J. P. Kelly, Hopkins' bookkeeper, were present, and the Hopkins half of the property was put up and bid in by Wright, in the name of one Huey Carberry, for $10,050, which was much more than was necessary to pay the balance due on the note, after crediting the amount for which the Tillman half had sold. The exact amount due on the note, principal and interest, at the date of the sale, was $———. The note being in the hands of attorneys for collection, ten per cent additional was claimed as attorney's fees. Hopkins at once employed Dudley G. Wooten, as hereafter stated. This was about 12 o'clock, noon, January 2, 1894. Wooten at once sent Hopkins to get a copy of the note and of the terms of the deed of trust, and other necessary information for preparing and filing a petition to enjoin the consummation of the sale by delivery of the deed. Wooten also instructed Hopkins not to let it be known what he was doing, and to lead the other parties to think that Carberry would carry out his bid, so as to get time for preparing and filing the petition and securing service of injunction. It took some two or three hours to get the necessary papers ready, but the petition for injunction was finally filed about 2:30 o'clock, p. m., and injunction granted and served on Pope a little after 4 o'clock p. m. In the meantime, Pope and the attorneys for the bank had made a second offer and sale of the Hopkins half of the property, and bid it off to Jerome C. Kearby for $6000, but the injunction was served on Pope before the sale was consummated by execution and delivery of the deed, although Kearby was then and is now, and has all along been, ready and anxious to pay the money and receive the deed.

"19. The Tillman property is worth less than the liens that were upon it, including one-half the original $10,000 note, and all the second lien notes. It has been worth less than the amount of the liens ever

since the second lien notes were executed.   It is worth more than the amount of one-half the first mortgage of $10,000.

"20.   The Hopkins property is worth more than one-half the $10,000 note.

"21.   On September 5, 1893, the Southern Distilling Company conveyed to P. T. Morey, who was president of the North Texas National Bank, and acting for it, the said Tillman property for a nominal consideration.

"22.   The National Bank of Redemption, for the purpose of protecting its interest in the Tillman property, has paid taxes and insurance upon the same, as follows:   Taxes, $814.90; insurance, $155, as set forth in its answer herein.   This has not been repaid.

"23.   Said $10,000 note was placed in the hands of attorneys for collection before the advertisement of trustee's sale by Pope.   Said vendor's lien notes are also in the hands of attorneys for collection.   The vendor's lien notes are past due and unpaid, having been declared due for default of interest.   The $10,000 is unpaid, unless and except as shown to the contrary, and is owned by the National Bank of Redemption, which also owns the $22,500 vendor's lien notes, transferred to it; all of said notes having passed to it as assets of and from the North Texas National Bank.   Weiss owns the remaining $5000 vendor's lien note.

"24.   Since the institution of · this suit, W. M. C. Hill has been appointed guardian to the estate of Maud Hopkins.   He has paid, by way of interest on one-half of the $10,000 note, chargeable against the Hopkins half of the property, to the National Bank of Redemption, the holder of the note, March 12, 1894, $400; August 2, 1894, $200.

"25.   The deed to Maud Hopkins was never delivered to her, and she has never seen it, but she had knowledge of it.   No valuable consideration was paid by Maud Hopkins.

"26.   At the time of the registration of said deed to Maud Hopkins, on July 2, 1891, S. B. Hopkins was heavily involved financially, and thereafter became actually insolvent, and is now insolvent, the North Texas National Bank being one of his creditors.   The Ninth National Bank of Dallas, of which Hopkins was a director, and with which he was actively connected, failed on July 1, 1891.

"27.   When the semi-annual installment of interest became due on August 4, 1893, on the $10,000 note, under the agreement mentioned, Bowling wrote to Hopkins and Tillman for the interest, as shown by the letters attached to plaintiff's petition.   Hopkins offered to pay $200, but Tillman and the Southern Distilling Company were unable to pay $200, and on that account failed and refused to do so.   Bowling, and the American National Bank, acting for Bowling, declined to receive less than $400, the full amount of the semi-annual interest at 8 per cent per annum.   Murphy & Bolanz had failed in business then, but as Bowling's agents they claimed the right to foreclose the deed of trust, and so notified Hopkins and Tillman, who contended that the default in payment of interest did not make the note due.   The full $400 was not

paid or offered to be paid, and no more interest was paid on said $10,000 note until after the institution of this suit, as herein set forth.

"28.    After demanding the $400 interest from Hopkins and Tillman, and notifying them that unless the full amount of the interest was paid, Bowling would at once foreclose the trust deed under the power of sale, Murphy & Bolanz, acting for Bowling, and learning that the North Texas National Bank had a second lien on the Tillman half of the property, notified the bank that unless the note was paid, Bowling would at once have the property sold out under the deed of trust. Thereupon the bank, to protect its second lien, purchased the $10,000 note from Bowling, paying the full amount of the principal and interest to date of purchase, and thereupon the following endorsement was placed on said $10,000 note: 'Without recourse on me, I assign the within note to ———— for value. [Signed] C. B. Bowling.' The note was thereupon delivered to the bank, the blank left for the name of the purchaser not being filled.

"29.    The trust deed in question provided, among other things, as follows: 'In case of failure or default of the payment of said promissory note, together with the interest thereon accrued, according to its terms and face, at the maturity of the same, then, and in such event, the said J. F. Kimball, or substitute, is by these presents fully authorized and empowered, and it is made his special duty, at the request of the said Mrs. Susan M. Knowles, or the legal holder of said note at any time, made after the maturity of said promissory note, to sell the above described property to the highest bidder for cash in hand at the court house door in the city of Dallas, Dallas County, and State of Texas, after giving public notice of the time, place and terms of said sale by posting a written notice on the bulletin board in the court house, in the city of Dallas, Dallas County, State of Texas, for at least twenty days prior to said day of sale, and after said sale as aforesaid, to make to the purchaser or purchasers thereof a good and sufficient deed in law to the premises so sold, with the usual covenants and warrants, and to receive the proceeds of said sale and the same to apply to the payment of said note, the interest thereon accrued, and the expenses of executing said trust, including one per cent, commission to said trustee, holding the remainder thereof subject to the order of myself, the said H. M. Spalding, or my legal representatives. And, whereas, for the better security of said note, I hereby agree to keep the buildings now on said premises, or that may hereafter be erected thereon, insured for the benefit of said Susan M. Knowles, or other legal holder of this note, in the sum of not less than $8000, and will deliver the policy or policies, with proper indemnity clause attached thereto; and it is hereby specially provided that should the same J. F. Kimball, from any cause whatever, fail or refuse to act, or become disqualified from acting as such trustee, then the said Mrs. Susan M. Knowles, or the legal holder of said note, shall have full power to appoint a substitute in writing, who shall have the same powers as are hereby delegated to the said J. F. Kimball; and I do by these

presents fully and absolutely ratify and confirm any and all acts the said J. F. Kimball, or his substitute as herein provided, may do in the premises by virtue thereof.'

"30. On January 2, 1894, John A. Pope, substitute trustee, proceeded to make the sale under the trust deed as advertised. The sale took place shortly before 12 o'clock, noon. The original Tillman half of the property was first offered for sale, separately, and sold to Theophilus King for $5800. The Hopkins half of the property was next offered for sale, and sold to Huey Carberry for $10,050. W. J. Moroney, attorney for the National Bank of Redemption bid the Tillman half of the property in for Theophilus King, who was vice-president of said National Bank of Redemption; and G. G. Wright, attorney for S. B. Hopkins, bought the Hopkins part of the property in the name of Huey Carberry. King and Carberry were not present at the sale in person.

"31. After the sale and the same day, John A. Pope, substitute trustee, executed and delivered to Theophilus King a deed in due form of law, properly acknowledged, purporting to convey to him the property purchased by him at the trustee's sale, and the following endorsement was placed on said $10,000 note: '$5726.05 being principal, interest and attorney's fees due up to date on one-half within note, paid by proceeds of sale by Jno. A. Pope, substitute trustee, to Theophilus King, of the east half of the property described in the trust deed from H. M. Spalding to J. F. Kimball, trustee, securing the within note. Dated this, January 2, 1894. [Signed.] John A. Pope, Substitute Trustee.' This was done by authority and direction of the National Bank of Redemption, the North Texas National Bank and Theophilus King.

"32. Pope also prepared, signed and acknowledged a deed in due form of law, to Huey Carberry, for the property bid in his name, but neither Carberry nor any one representing him could be found who would pay the amount of his bid, and Pope thereupon, the same day, a few minutes before 4 o'clock p. m., resold the property previously sold to Carberry, at which resale the property was bid in by Jerome C. Kearby in person, and for himself, for the sum of $6000, and a signed memorandum of such sale, made at the time in writing on the back of the notice of sale, in the following form, to-wit: 'Sold to J. C. Kearby for $6000, 1/2, 1894. John A. Pope, Substitute Trustee, J. C. Kearby.' John A. Pope, substitute trustee, prepared, signed and acknowledged a deed in due form of law to Kearby for the property so purchased, but before the deed could be delivered an injunction in this case was served on him, restraining him, as prayed for in plaintiff's original petition. The same day, after the injunction was served on Pope, Kearby tendered to Pope $6000 in legal tender money, and demanded a deed which Pope refused to deliver on account of the service of the injunction. Kearby has always been willing, and is now willing to make his bid good and pay the amount of the same on receipt of a deed.

"33. Before the sale, Hopkins learned that the property was adver-

tised for sale, and employed G. G. Wright, an attorney at law, to enjoin the sale. Wright, on his own responsibility, came to the conclusion that the interests of Hopkins could be best protected by allowing the sale to proceed, and buying the property at the sale in Hopkins' interest, expecting to be able to himself arrange to purchase the Hopkins' half of the property for the amount of the debt, interest and trustee's fees, primarily chargeable against the Hopkins half of the property, and to then extend the loan to suit Hopkins' convenience. Wright attended the sale for this purpose. Unexpected competition forced the property up to $10,050 at which figure he bid the property in in the name of Huey Carberry. After the sale, however, he voluntarily decided not to carry the sale through, and when he informed Hopkins of what had occurred at the sale, Hopkins at once employed Dudley G. Wooten, attorney at law, to bring this suit to enjoin further proceedings. Before this injunction was served the property had been again bid off to Kearby, as hereinbefore stated. When Kearby purchased at the sale, he had no actual knowledge of what had previously occurred, and simply understood that he was buying the property at a valid trustee's sale. The property was sold in separate parcels, by agreement with G. G. Wright, he wishing to bid on the Hopkins half alone. When Hopkins employed Dudley G. Wooten to bring the injunction suit, he sent his bookkeeper, Joseph P. Kelley, to W. J. Moroney to get a copy of the $10,000 note to aid his attorney in framing his petition. Kelley found Moroney in the office of the North Texas National Bank about 2:30 p. m., and copied the note without saying why he was doing so, except that it was at Hopkins' request. Moroney then told Kelley that Carberry's bid would have to be complied with immediately. Kelley replied that Wright had the money, and that if he did not do so, Hopkins would, as he had just gone to lunch, and in a few minutes would come down and attend to the matter. Kelley then went away. About 3 o'clock p. m. Hopkins came to the bank and enquired for Pope, who was then absent. Moroney told Hopkins that he had the trustee's deed to Carberry for inspection and handed it to Hopkins, who examined it and handed it back to Moroney. Moroney then told Hopkins that the money would have to be paid by 3:30 p. m., and hearing nothing further from Hopkins, Wright or Carberry, Moroney instructed Pope to re-sell, which he proceeded to do as hereinfore stated. Kelley had no authority for Hopkins in regard to this note and trust deed, but was his bookkeeper in other business.

"34. By settlement between the North Texas National Bank and Tillman, on September 4, 1893, Tillman was released from all personal liability, in consideration, in part, that the bank should become absolute owner of the $22,500 in collateral vendor's lien notes, with the right to foreclose the lien on the land, etc., it being understood by the bank in this settlement that Tillman still held the other $5000 vendor's lien note, whereby it would be postponed until the $22,500 notes were paid. Weiss, the holder of this $5000 note, knew nothing of this

transaction. The bank did not notify Tillman personally of the sale, because it did not consider him personally interested in the same. The bank had no information that Weiss had purchased said $5000 note until Weiss intervened in this suit, after the sale had been made. The deed from the Southern Distilling Co. to Morey was made in order to keep the property insured, the Southern Distilling Co. not having the means to pay premiums, and the insurance companies being unwilling to issue policies to it, or in its name. Morey was president of the North Texas National Bank, pending its liquidation, and acted for the bank in this transaction. There was no concealment from Tillman of the sale under the $10,000 mortgage, but neither Tillman nor Weiss knew of it, until afterwards; but all parties understood by the bank at the time to have any interest in the sale, had actual notice of the same, and, so far as the bank then knew, raised no objections to the sale. A day or two before the sale, Hopkins told W. J. Moroney that Wright would represent him at the sale. When Murphy & Bolanz were trying to collect the interest from Tillman, he referred them to the North Texas National Bank, the then owner of the $22,500 vendor's lien notes, but Tillman was not notified of the sale."

*Opinion.*—Under his assignments of error the appellant contends that the sale to him was valid on each of the following grounds:

"(1) The agreement to extend, having been made without the knowledge or consent of a second mortgagee, the North Texas National Bank, and to its substantial and serious prejudice, was void as to it, and it had the right, as it did, to pay the holder the amount of the note, take an assignment of it, and immediately foreclose for its own protection.

"(2) The agreement to extend, having been made without legal authority of Maud Hopkins, the minor owner of the property in question, was void as to her, and was therefore void in toto.

"(3) If S. B. Hopkins had the right to make the agreement on behalf of his minor daughter, Maud Hopkins, he had an equal right to waive it, and, having done so, and consented to the sale, it cannot be objected by her, after the sale, that it was premature.

"(4) The agreement to extend was without consideration and therefore void.

"(5) The agreement to extend was void under the statute of frauds.

"(6) The agreement being executory, and Hopkins and Tillman having wholly failed and refused to perform the same in whole or in part, without just cause or excuse, the holder of the note, under the facts of this case, had the legal right to elect to treat the agreement as abandoned and assert his rights under the original contract."

We will consider each in the order presented:

1. It is an elementary principle of equity that a subsequent mortgagee has the right to discharge the first mortgage at its maturity and stand in the place of and be subrogated to all the rights of the first mortgagee. This right is given for the purpose of enabling the second lienholder to

protect himself by preserving his security, so far as he can, against the prior incumbrance, and subject it to the satisfaction of his demand; and the exercise of the right is determinable from the purpose for which it is given. It cannot be exercised for the purpose of injuring or obtaining an undue advantage over either the prior mortgagor or mortgagee, or preventing them from dealing with each other as they choose respecting the mortgage existing between them, so long as they do not impair the security of the subsequent mortgagee. The discharge by the subsequent lienholder of a prior mortgage and the consequent right of subrogation has so often been successfully used as an engine of destruction to the rights of the mortgagor, that he who avails himself of it has lost sight of the fact that it was given only for his protection, and has come to believe that it was given for the purpose of placing the mortgagor in his power, so that through it he may work his ruin. The subsequent mortgagee is the master neither of the mortgagor nor prior mortgagee, nor has he such authority or control over them or either of them that they needs must go to him and supplicate his consent to exercise their freedom of contract; and if, without his consent, they have exercised this freedom, it is none of his business so long as he is uninjured by it. What have the mortgagors and prior mortgagee in this case done to injure the holder of the subsequent mortgage,—or rather, what has S. B. Hopkins or his minor child done? The North Texas National Bank nor its assignees ever obtained any lien upon the Hopkins' half of the property; the subsequent lien held by it and its assignees only extended to the half interest owned by Tillman, and as to the interest of Hopkins or his daughter no subsequent lien ever attached. In taking a lien on Tillman's interest after the lot had been partitioned, the Southern Distilling Company, the North Texas National Bank, and their assignees, necessarily recognized the validity of the partition and knew that they were not subsequent lienholders on the Hopkins half, and consequently, as to that in tract, they had no right to discharge the prior mortgage and to stand in the place of C. B. Bowling, the holder of the first lien. When they took up the Bowling note, they were of course subrogated to his lien on the entire lot, but this did not charge the Hopkins half of the property with any of the money the second lien was given to secure. It was only charged with its pro rata share of the original debt, and was as free from the subsequent one, which was only a lien upon the Tillman property, as though such debt had never existed. This original debt had been extended by an arrangement satisfactory to Bowling, Tillman and Hopkins, and as the original lien of the North Texas National Bank did not cover the Hopkins half of the lot, so far as it was concerned it was a matter of no moment to the bank or its assignees whether it was extended or not. And as Jerome C. Kearby, who claims that the sale of the Hopkins half to him was valid, has alone appealed from the judgment, it is hardly necessary to inquire whether the extension of the original debt, so far as it was a lien on the Tillman half of the property, could be made without the consent of the subsequent lien-

holder or not.   But it is laid down as a general rule that the extension of the time of payment of a mortgage in no way impairs the security as against subsequent incumbrancers, even if effected by a renewal of the mortgage note.   Jones on Mortgages, sec. 942;  Bank of Utica v. Finch, 3 Barb., ch. 293.   If this rule is correct, the consent of the subsequent incumbrancers was not necessary to the extension of the debt to the extent of the lien on the part of the property allotted to Tillman.

2.   We cannot agree to the correctness of the proposition that the agreement to extend was made without the authority of Maud Hopkins, and was therefore void as to her, and in toto.   The property had been conveyed to her by her father as a gift, with his note secured by the mortgage outstanding as a lien upon it.   She had not assumed the payment of this note, nor could she, being a minor, be held personally liable thereon; it remained the personal obligation of her father and a charge upon the property she received from him; and as she took the property cum onere, she could not, being unable to discharge the note herself, object to her father's obtaining an extension of the time of its payment; and if her consent was necessary, it might well be presumed, in the absence of evidence to the contrary; for what her father did, was in her interest as well as his own, and was intended to preserve the property from foreclosure until such a time as he would be able to pay for it and thus secure to her its unincumbered ownership.   But as the mortgage was simply an incident to a debt which she did not owe, the one from whom it was due could prolong its payment, whether she consented to it or not, and such extension would necessarily carry with it the mortgage.   The parties through whom appellant seeks to claim the property had no lien or claim against the part owned by Maud Hopkins when her father procured the extension of the payment of the debt which was a lien upon it, and the appellant wants this court to say now, that because she was a minor and could not contract for an extension of the time herself, she cannot avail herself of the benefit of a contract made in her interest by her father, and that therefore her property must be taken from her on a sale that would have been void had she been old enough to sanction the contract made in her interest.   We shall say no such thing.   As those through whom appellant would claim had no lien of any kind on the property when the debt was extended, it is none of their business whether Maud Hopkins consented to it or not.   She has not complained of her father's actions, and if he made a valid contract of extension that was sufficient to protect her from the consequences of the sale of her property at which appellant bought, she should have the benefit of it, though she was a minor.

3.   It is unnecessary to consider the question as to whether one who has the right to make a contract for the benefit of a minor, after he has made it has an equal right to waive it.   But we will say the proposition that the right to waive a contract beneficial to an infant necessarily follows the right to make such contract, finds no support either in principle or authority.   But as in this case the evidence shows that S.

B. Hopkins never waived the benefit to his daughter of the contract to extend the debt for which the property was sold, nor consented to its sale, we will not discuss the question as to whether she could object to a premature sale of her property. As the benefit was not waived she had the right to avail herself of it, as she has done.

Before considering the other three grounds upon which the validity of the sale is urged, we will say that as the conveyance by S. B. Hopkins of the property claimed to be purchased by appellant to his daughter did not affect the mortgage lien held by Bowling upon it; and as The North Texas National Bank nor its assignees were the creditors of Hopkins before the assignment to them of the note by Bowling, it is immaterial to appellant whether or not such conveyance was made by S. B. Hopkins in bad faith, and with intent to defraud his creditors. Only creditors of a grantor, or those whose interest may in some way be affected by his conveyance, can inquire into or question his intention or motive in making it. Therefore the trial court did not err, as is complained of in appellant's fourth assignment, in not finding as a fact that the deed to Maud Hopkins was made by her father in bad faith and with intent to defraud his creditors; nor in failing to find, as is complained of in the sixth assignment, that it was understood that the deed to Maud should be, so far as S. B. Hopkins was concerned, purely formal, and that he should retain the beneficial ownership of the property notwithstanding the deed.

4. Was the agreement to extend without consideration, and therefore void? It will be observed from the conclusions of fact, that the note originally bore interest at the rate of 7 per cent per annum, and that on February 4, 1891, after it became due, it was extended for two years from that date, upon the agreement of Tillman and Hopkins to pay interest at the rate of 10 per cent per annum; and, the interest being paid up to February 4, 1893, the termination of the period of extension, it was again extended, if at all, on the 14th of February, 1893, upon the agreement of Tillman and Hopkins, to pay interest semi-annually at the rate of 8 per cent per annum for two years from that date. It is this extension that is attacked for want of consideration. In Benson v. Phipps, 87 Texas, 580, the Supreme Court, speaking through Chief Justice Gaines, says: "In case of a debt which bears interest either by convention or operation of law, when an extension for a definite period is agreed upon by the parties thereto, the contract is, that the creditor will forbear suit during the time of the extension, and the debtor foregoes his right to pay the debt before the end of the time. The latter secures the benefit of the forbearance; the former secures an interest-bearing investment for a definite period of time. One gives up his right to sue for a period in consideration of a promise to pay interest during the whole of the time; the other relinquishes his right to pay during the same period, in consideration of the promise of forbearance. To the question, why this is not a contract, we think no satisfactory answer can be given. It seems to

us it would be a binding contract, even if the agreement was that the debt should be extended at a reduced rate of interest." And in distinguishing this case from Austin Real Estate & Abstract Co. v. Bahn, 30 S. W. Rep., 430, in his opinion in the latter case he says: "In Benson v. Phipps, the principal maker of the note and the payee agreed upon an extension for twelve months, from which the promise was implied on the part of the former not to sue, and upon the latter not to pay, within the stipulated time. The promise of the debtor to forego his right to pay at any time after the note was originally due, secured to the creditor the absolute right to secure the interest for the entire time of the extension, and continued the consideration for the creditor's promise."

The soundness of the principles expressed in the above quotation could not, perhaps, be better illustrated than by the case under consideration. After the expiration of the first period of extension, Bowling, the holder of the note, desires to have it again extended on the same terms as before; the payees, Tillman & Hopkins, are unwilling to consent to an extension on the same terms, but are willing for it to be extended for two years, upon the terms finally agreed upon. It is to be presumed that these parties understood their own business and can manage their own affairs and are competent to judge and pass upon what, as between themselves, will be a sufficient consideration to support an agreement. If Bowling, deeming his debt secure, preferred interest on it for two years at 8 per cent per annum to the payment of his money when due; and Tillman and Hopkins preferred paying such interest for that period to paying the debt at its maturity, and they all came to an agreement expressive of their wishes, no one, not even themselves, can question the sufficiency of the consideration upon which the agreement was founded. To say that such an agreement is without consideration would be to hold that when one's debt is due, though he may prefer and deem it to his best interest to extend it upon an agreement of his debtor to pay a stipulated interest, he must take his money, which he may have no immediate use for, and risk lending it upon security as good as he has, and for interest equal to what his debtor is willing to pay; and though the debtor can better afford to pay interest that his creditor is perfectly willing to take than to raise money to pay the matured debt, he must get the money at any sacrifice and discharge an obligation his creditor is perfectly willing to prolong, and thus, without reason, deprive parties of substantial rights, and prevent them from conducting their business as they choose. The agreement to extend was supported by a sufficient consideration.

5. Is this agreement void under the statute of frauds? As the agreement of extension could not be performed within the space of a year from the time it was made, we think the statute requires a memorandum of it to be in writing and signed by the party charged therewith, in order to make it effective. Rev. Stats. (1879), art. 2464; Reed on Stat. of Frauds, sec. 190; Grace v. Lynch, 80 Wis., 166; 49 N. W.

Rep., 751. Without reiterating the facts found in the twelfth conclusion, we think that a reference to them will show sufficient memoranda in writing signed by the parties charged with the agreement of extension to relieve it of the statute of frauds. The statute does not require the writing to be signed by both parties, but only the party charged therewith. A letter may be a sufficient writing to comply with the statute, so that it contain enough to show a valid agreement, and that it was concluded, and not a mere offer or treaty, or an agreement with conditions annexed. Troy Fertilizer Co. v. Logan, 12 So. Rep., 712. It is held in this State that when one party to a written contract signs it and the other accepts it without signing, the one failing to sign is bound thereby, and is entitled to its benefits the same as if he had signed. Martin v. Roberts, 57 Texas, 568; Campbell v. McFadin, 71 Texas, 31. Murphy & Bolanz, the agents of Bowling, the holder of note, received from Tillman and Hopkins $250 for negotiating the extension. The negotiation was by letters written by such agents to their principal and by him to them, and shows fully the terms of the agreement of extension. Murphy & Bolanz were authorized by Tillman and Hopkins to negotiate the extension agreed upon, as is evidenced by their paying them for such services.

6. The proposition here contended for is: That the agreement being executory, and Tillman and Hopkins having wholly failed and refused to perform it, either in whole or in part, without just cause or excuse, the holder of the note had the right to treat the agreement as abandoned, and assert his rights under the original contract. This proposition assumes as a matter of fact that Tillman and Hopkins failed and refused to perform their part of the agreement without just cause or excuse. Is such assumption warranted by the evidence in the record? The first installment of interest under the extension fell due August the 4th, 1893. The North Texas National Bank then held the Southern Distilling Company's notes to Tillman which were endorsed by him for $22,500, and were a lien on Tillman's half of the lot; the Southern Distilling Co. and Tillman were insolvent, the latter so involved that he was unable to meet his part of the interest then due on the extended note. Hopkins was then ready and willing to pay his part of the interest and tried to do so through the American Bank at Dallas, and so informed Bowling by letter and tendered the money at the bank, but the holder of the note was not willing to accept it without the other part being provided for. Under these facts, was it not as much the duty of The North Texas National Bank to provide for the payment of Tillman's part of the interest as it was Hopkins'? The bank, under these facts, was practically the owner of Tillman's half of the property; on September 5th, just 31 days after the interest installment became due, a deed to the property was in fact made by Tillman conveying the property to the president of the bank for its use. Up to this time Hopkins was ready, willing and anxious to perform his part of the agreement, and there had been no election by Bowling to rescind the contract on ac-

count of its non-performance by the other parties. He still held the note and was willing to abide by his part of the contract, if the other parties would carry out theirs. The North Texas National Bank was standing in Tillman's shoes, holding the property subject to his contract of extension, and instead of joining with Hopkins, as it was its duty in good conscience to do, in the payment of the installment of interest, it concluded that the shoes of Bowling would fit it better than Tillman's, and, on October, 1893, attempted to put them on by becoming the holder of the original $10,000 note, before held by C. B. Bowling. Now it elects, as Bowling had never done, to rescind a contract which it was its duty in part to perform, and says to him who was anxious to perform his part of the agreement, "you shall not enjoy its benefits, but that which thou hast as well as that which thou hast not shall be taken from you." This is not right. Thus it is seen that the assumption of fact embodied in the proposition is not warranted by the evidence, and the part of the proposition asserted as law, in the absence of the assumed facts, has nothing to rest upon. It therefore becomes unnecessary for us to give it further consideration.

When the time of payment of a mortgage is extended, the right to foreclose is suspended until the expiration of the extended time, and the extension has the effect in equity of modifying the original condition of the mortgage to the same extent as if the time of the new agreement was incorporated in the condition. Jones on Mortgages, sec. 1190; Insurance Co. v. Bonnell, 35 Ohio St., 365.

The sale being premature, the trial court did not err in vacating it, and in enjoining the execution and delivery by the trustee of the deed to appellant. Its judgment is therefore affirmed.

Writ of error refused.                                    *Affirmed.*